IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

THE UNITED STATES OF AMERICA,
on the relation of Jodi Miller,

        Plaintiffs,

                                        **Filed *in camera* pursuant to**
                                        **31 U.S.C. sec. 3730(b)(2)**
v.                                       Case No.: 12-cv-885

SSM HEALTH BUSINESSES,
and HOME HEALTH UNITED, INC.,

        Defendants.

_____

### THIRD AMENDED COMPLAINT FOR DAMAGES and INJUNCTIVE RELIEF UNDER THE FALSE CLAIMS ACT

*QUI TAM* ACTION FILED UNDER SEAL
_____

NOW COME THE PLAINTIFFS, THE UNITED STATES OF AMERICA, on relation of Jodi Miller, by their attorneys Gingras, Cates & Luebke, by Paul A. Kinne, and hereby state and allege the following as their Third Amended Complaint in the above referenced matter.

### NATURE OF THE PROCEEDINGS

1.      This action is brought on behalf of the United States of America to recover all damages, penalties and other remedies established by and pursuant to 31 U.S.C. §§3729-3733, and on behalf of relator Jodi Miller to claim entitlement to a portion of any recovery obtained by the United States as a *qui tam* plaintiff authorized by 31 U.S.C. §3730.

2.      Relator brings this action to impose liability upon defendants for violations of 31 U.S.C. §3729 and non-compliance with various federal regulations by submission to the United States of certain claims for monetary reimbursement for in-home health care provided to

clients/patients through the United States' Medicare programs to the extent such claims were not eligible for such payment because they did not meet the requirements for payment due to the defendants' non-compliance with Medicare and other laws and regulations relating to in-home health care eligibility.

JURISDICTION AND VENUE

3.      Jurisdiction lies in this Court pursuant to 28 U.S.C. §§1331, 1345 and 31 U.S.C. §3732(a).

4.      Venue is proper in the Federal District Court, Western District of Wisconsin *inter alia*, pursuant to 28 U.S.C. sec. 1391 because the defendants are subject to personal jurisdiction in the Western District of Wisconsin based on their systematic and continuous contacts in this district.

5.      Relator previously communicated with the Department of Justice assistant U.S. attorneys to provide information and notify them that she was intending to file this action. The United States has declined to intervene in the action.

PARTIES

6.      Relator brings this action on behalf of the United States of America pursuant to 31 U.S.C. sec. 3730(b)(1). The United States of America is a sovereign country whose Department of Health and Human Services pays claims to the defendants through its Medicare program for in-home health care provided by the defendants based upon bills submitted by the defendants.

7.      Jodi Miller is a citizen of the United States of America and a resident of the State of Wisconsin, residing at W1944 Mickelson Road, Fall River, Wisconsin 53932. Miller was employed with the defendants.

2

8.      SSM Health Businesses (SSM) (owning and operating SSM Home Care) is a business based in Missouri that also operates in Wisconsin.  It owns, manages and is affiliated with hospitals in Missouri, Wisconsin, Illinois and Oklahoma.  SSM Health Businesses co-owns a share of Home Health United, Inc.

9.      Home Health United, Inc. (HHU) is a business operating in Wisconsin.  Home Health United, Inc. is owned by SSM Health Businesses.

<u>FACTUAL ALLEGATIONS</u>

10.      Medicare employs a Home Health Prospective Payment System (HH-PPS).  HH-PPS reimburses home health service providers at a rate based on a sixty-day episode of home health services.

11.      The rate is adjusted based on data submitted by the home health service provider to Medicare.  The home health service provider must submit this data using the Outcome and Assessment Information Set (OASIS).

12.      Medicare uses the OASIS data to adjust the payment to the provider by categorizing the home health service into one of 153 potential "case mix classifications." The OASIS data include diagnostic codes that are entered into three separate data elements within OASIS, and the rules governing whether a diagnosis should be included in these data elements are located in the OASIS-C Guidance Manual.

13.      The OASIS-C Guidance Manual specifically states that providers must ensure that the secondary diagnoses assigned to M1022 are listed in the order to best reflect the seriousness of the patient's condition and justify the disciplines and services provided. Agencies should avoid listing diagnoses that are of mere historical interest and without impact on patient progress or outcome. The diagnosis may or may not be related to

3

patient's recent hospital stay but must relate to the service rendered by the home health care provider.

14.     The diagnostic codes submitted in the OASIS data can affect the adjusted rate of reimbursement.  Home health care providers are aware of which mix of codes result in a higher rate of reimbursement.

15.     HHU provides health care in the homes of patients who need in-home care.  That care is typically provided by a HHU nurse.

16.     HHU is paid for the health care services it renders.  When a third party, such as a private insurance company or Medicare, is responsible for payment, ICD-9 diagnostic codes must be assigned to the treatment provided so the services provided by HHU can be billed to the third party.

17.     SSM employs home health coders who assign the diagnostic codes to the treatment provided by HHU health care providers, ostensibly at the direction of those providers.

18.     With respect to patients covered by Medicare, the United States (via Medicare) pays HHU for services provided to qualified beneficiaries.

19.     Once HHU has received payment from Medicare, HHU then reimburses SSM for the coding services it provided.

20.     In particular, the billing process for HHU works as follows: a patient is referred for home health services by his or her doctor. A HHU nurse performs an in-depth assessment of every new patient. HHU nurses share their findings and a suggested plan of care with their patient's doctor. It is the HHU nurse who is supposed to determine the proper diagnostic code to assign to the treatment provided.

21.     Most of the patients receiving in-home care are very ill and suffer from a multitude of ailments.  To promote accurate and equitable billing practices, Medicare requires health care providers like HHU to comply with the OASIS standards when seeking payment from Medicare.

22.     The HHU nurse who establishes the patient's start of care will notify coders for SSM of their findings that identify conditions (diagnoses) related to the current home health plan of care. Nurses and / or coders are expected to comply with ICD-9-CM Official Guidelines assigning primary and secondary diagnoses to the OASIS items M1020 and M1022a-f by coding the diagnoses supported by the patient's medical record documentation (i.e. the home health plan of care and clinical comprehensive assessment).

23.     The primary diagnosis must relate to the services rendered by the home health agency. Other diagnoses, or secondary diagnoses, are defined as all conditions that coexisted at the time the plan of care was established, which developed subsequently, or which affect the treatment or care of the patient.

24.     The HIPAA Code and Transaction Set require that the billing claim be compliant with HIPAA, which mandates that only unresolved diagnoses be reported. Diagnoses in M1020a (Primary Diagnosis), M1022b-f and other pertinent diagnoses (Other Diagnoses) are entered on the billing claim. Items in M1024 Column 3 and Column 4 (payment Diagnoses) are not reported in any field of the billing claim form.  This process is consistent with Appendix D-1 of the OASIS-C Guidance Manual.

25.     There is a set of Medicare rules that applies to the appropriate ranking of billing codes in the billing statements which affects the amount of compensation HHU, and indirectly SSM, receive from Medicare.

26.     An example of Medicare instructions germane to this case includes instruction / regulations on proximate diagnosis and the underlying condition.  Billing entities such as HHU must list the diagnosis that is the most immediate cause of the care.  When the proximate diagnosis is the main reason for home care, it is properly reported as the "primary diagnosis" and the underlying condition is the "secondary diagnosis."

27.     The billing field into which the diagnostic codes are placed affects the amount of compensation received by the health care provider.  The order in which the codes are placed into the billing fields also affects the compensation received by the health care provider.

28.     In November, 2011, Miller began her employment with HHU.

29.     On or about July 2, 2012, Miller transferred employment to SSM where she was to assist the company with coding. She was hired as a medical coder.

30.     Miller coded HHU patients under the direction of SSM supervisor Glenda Tate. Tate also supervised coders Diane Sartin and Valerie Brengard.

31.     Miller resigned on July 26, 2012.

32.     Miller did not work in the actual billing office so the precise details of when bills were submitted to Medicare is unknown to her, as is the exact physical location of the person submitting the bills.  At present, this information is unavailable to her.  In her position, however, she was aware of the codes that were assigned when the bill was "locked" and ready for submission to Medicare.

33.     SSM and / or HHU are in sole possession of the information necessary to determine which employee "hit the 'submit' button" with respect to bills HHU submitted to Medicare for payment.

34.     SSM coders or their supervisors (via bills submitted to Medicare) made knowingly false statements on behalf of HHU with respect to the assigned diagnoses in order to receive money from the government (Medicare) to which SSM and HHU were not entitled.  That is, the SSM coders knowingly assigned codes in the bills HHU submitted to Medicare that reflected treatment that the patient did not actually receive, in order to be paid for treatment HHU never provided to the patient, and HHU was aware of and directed SSM's conduct in this regard.

35.     SSM coders or their supervisors (via bills submitted to Medicare) made knowingly false statements on behalf of HHU with respect to the assigned diagnoses in order to receive money from the government (Medicare) to which SSM and HHU were not entitled.  That is, by violating the rules and knowingly listing the codes in the wrong order, SSM and HHU received compensation from Medicare to which they were not entitled because of false or fraudulent statements. HHU was aware of and directed SSM's conduct in this regard.

36.     Miller has first-hand knowledge of the following examples of false statements (often in the form of up-coding) made to receive money, which include:

        a.      SSM Coder Diane Sartin submitted a bill coded for  a groin ulcer (case mix), Gastro Esophageal Reflux Disease (GERD) and muscle weakness when those codes were not accurate.  The matter was coded for a "chronic ulcer of the unspecified site" (DX 707.9), when it should have been coded as 695.89 (intertrigo) or 782.1 (rash).  The bill was coded by SSM Coder Sartin on July 13, 2012, and locked by a HHU nurse on July 16, 2012.  This matter pertained to patient V.S. The doctor referral noted "unstable balance," and the HHU physical therapist noted a rash.  SSM also made the false statement to Medicare that "groin

7

ulcer" was the treatment under the primary billing code when it was not the treatment that should have truthfully been listed under the primary code. (The code fraudulently used by SSM created an improper "case mix" which meant greater payment from Medicare). SSM also made the false statement to Medicare that V.S. received treatment for "muscle weakness" when she did not receive such treatment. SSM should have billed for "unstable balance."

b.       SSM submitted a bill coded for a knee replacement for osteoarthritis when actually a knee revision was performed for a mechanical complication of loosening of a prosthetic knee joint. This matter was billed to Medicare by SSM Coder Sartin on July 13, 2012, and an HHU nurse locked it on July 13, 2012. SSM billed (via HHU) Medicare under an osteoarthritis case mix diagnosis (code 715.96 in position M1024 field) when the knee replacement was completed two years prior to the then-current treatment. A knee replacement of osteoarthritis inaccurately represented the patient's health status which allowed for an unwarranted case mix / higher reimbursement rate. That is, SSM claimed to Medicare that L.K. received care that he did not actually receive in an effort to secure payment under fraudulent circumstances.

c.       SSM submitted a bill coded for problem gait, GERD and muscle weakness when it was not appropriate. This pertained to patient C.G. The bill was submitted to Medicare by SSM Coder Valerie Brengard on July 13, 2013, and locked by an HHU nurse on July 16, 2013. The primary complaint for needing home health care was right shoulder pain, with the patient refusing occupational therapy for his wrist fracture. The patient had already received physical therapy

8

for the gait issues in the hospital / rehab.  SSM made the false statement to Medicare that HHU provided care to C.G. for a problem gait, GERD and muscle weakness when no one at HHU provided care for those conditions. They coded Abnormality of Gait (781.2); Muscle Weakness (728.87), Personal History of Falls (V155.1) with Hip Fracture 820.8 listed on M1024 field); Toxic Goiter (242.00) and Hypertension (401.9).

d.      SSM submitted a bill coded for GERD (via HHU) when the patient was not taking medication for this condition.  This matter pertained to patient V.D. The physician's order was for "deconditioning" due to weak muscles. SSM Coder Sartin chose to code a primary diagnosis of Parkinson's disease (code DX 332.0, a case-mix code), instead of muscle weakness.  Records state, "Patient previously diagnosed with Parkinson's disorder has improved off meds and has now acquired ability to walk but muscles deconditioned."  Sartin coded for muscle weakness as number seven instead of primary.  GERD was coded in the  top six, but the patient took no medication for GERD nor was GERD part of the plan of care.  Therefore, Sartin made the following false statements about V.D.: 1) by coding for GERD, she informed Medicare that the patient had received treatment for the condition when she had not; 2) muscle weakness should have been listed as the primary code, resulting in lower compensation; 3) Parkinson's disease should not have been listed as the primary code:  by listing it as primary, it fraudulently increased compensation to SSM and HHU.  These bills were submitted by SSM Coder Sartin on July 13, 2012, and locked by an HHU nurse on July 23, 2012.

e.      SSM  submitted bills for asthma and GERD (via HHU) for a patient who
was referred to in-home health care for wound care only. SSM Coder Valerie
Brengard coded this patient's standard of care. This pertained to patient B.K.  The
bills were submitted by SSM Coder Brengard on July 13, 2012, and locked by an
HHU nurse on July 17, 2012.  B.K. suffered from a pressure ulcer on the buttocks.
The proper way to code for this condition per the official ICD-9 Coding
Guidelines was to list the pressure ulcer site first, then the stage.  By listing the
stage as primary, it resulted in a higher-than-allowed reimbursement rate due to
the stage diagnosis being case mix. Additionally, B.K. was quadriplegic.
Medicare already paid for private duty nursing. HHU was only treating B.K. for
specific wound care.  Accordingly, the SSM Coder Brengard knowingly made
false statements to Medicare to secure payments to which HHU and SSM were
not entitled because the bills indicated B.K. received treatment from HHU for
GERD and asthma when B.K. did not receive this treatment.  Moreover, by listing
the ulcer stage as primary as opposed to the location of the pressure ulcer, SSM
and Brengard made a false statement about the treatment B.K. received and his
condition.  This fraudulent billing took place when it was coded by Brengard on
July 13, 2013, and locked by an HHU nurse on July 17, 2013.

f.      In July, 2012, SSM submitted false bills (via HHU) associated with a lung
cancer patient "s/p RML lobectomy 10.12.2011, s/p chemotherapy and radiation
1.2012, complicated by radiation pneumonitis."  This matter pertained to patient
B.W.  SSM inaccurately coded this patient's resumption of care ("inpatient
6.6.12-6.19.12") with a diagnosis of "lung cancer" and COPD with acute

bronchitis, both case mix. In coding the resumption of care inaccurately, the recertification diagnosis for the patient was submitted to Medicare and resulted in a higher-than-allowed reimbursement rate.  B.W.'s hospitalization in June, 2012, was for treatment of hemoptysis, etiology most likely being multifactorial.  There was no indication of relapse of lung cancer.  Accordingly, by billing Medicare for treatment for lung cancer, SSM (via HHU) fraudulently sought payment to which it was not entitled.

g.      SSM coded patient I.T. with acute posthemorrhagic anemia even though the condition had been resolved.  The patient was hospitalized with a hip fracture and moved to a swing bed prior to the start of in-home care health services.  By coding and billing Medicare for a resolved case-mix diagnosis on this patient's profile it prompted an inappropriate higher reimbursement rate.  Claiming reimbursement for treatment not provided (because the condition had resolved prior to HHU involvement) was fraud on Medicare.  This bill was coded by SSM Coder Sartin on July 13, 2012, and locked by a HHU nurse on July 23, 2012. The individual who made the false statement was Sartin. The actual false codes were Hip Fracture (781.2); Posthemorrhagic Anemia (285.1); General Osteoarthritis (715.00) and Anxiety (300.00).

37.     Paragraph 36 a-g represent instances of SSM (on behalf of HHU) taking a diagnosis not related to the plan of care and listing the diagnosis in a way that made it appear out of the order that would best reflect the seriousness of the patient's condition.  This resulted in a false statement; SSM's listing represented a more lucrative case-mix that did not exist.  This was

done knowingly and in an attempt to secure payment from Medicare to which neither SSM nor HHU were entitled.

38.     Paragraph 36 a-g represent instances of SSM (on behalf of HHU) listing diagnoses that did not justify the discipline and the services provided.  This resulted in a false statement; SSM's listing represented a more lucrative case-mix that did not exist, and claimed treatment that was not provided.  This was done knowingly and in an attempt to secure payment from Medicare to which neither SSM nor HHU were entitled.

39.     Paragraph 36 a-g represent instances of SSM (on behalf of HHU) listing diagnoses that were not related to the services rendered on behalf of HHU.  This resulted in a false statement; SSM's listing represented a more lucrative case-mix that did not exist, and claimed treatment that was not provided.  This was done knowingly and in an attempt to secure payment from Medicare to which neither SSM nor HHU were entitled.

40.     Paragraph 36 a-g represent instances of SSM (on behalf of HHU) listing diagnoses that were of mere historical interest without impact on patient progress or outcome. This resulted in a false statement; SSM's listing represented a more lucrative case-mix that did not exist, and claimed treatment that was not provided.  This was done knowingly and in an attempt to secure payment from Medicare to which neither SSM nor HHU were entitled.

41.     Paragraph 36 a-g represent instances of SSM (on behalf of HHU) listing diagnoses that should have been listed last or not at all.  These listings prove that SSM and HHU were "cherry picking."  They were knowingly leaving off the diagnoses most related to the plan of care and, for example, inserting GERD in violation of the OASIS-C Manual to increase payments from Medicare to which they were not entitled.

42.     In each of the examples listed in paragraph 36, SSM provided a false record or statement to get a false or fraudulent claim paid by the government when HHU submitted the bill knowing it to be false.  That is, SSM, on HHU's behalf, assigned a diagnostic code that did not comply with the OASIS-C Manual.  By listing secondary diagnoses that were not proper under the OASIS-C Manual, the claims themselves were false because the listing placed the patient in an improper and more lucrative case-mix classification.

43.     On at least two occasions, it was the SSM coder who made the final decision about the code to assign to the treatment, not the HHU nurse or health care provider.

44.     Tate was responsible for final approval of all codes assigned by coders prior to submission.

45.     Tate approved all of the fraudulent codes described in paragraph 36.  At the time of her approval, Tate knew each was false and fraudulent, and she knew that by approving the fraudulent codes, a fraudulent statement would be submitted to the United States that would result in payment to which her employer (SSM) and HHU were not entitled.

46.     While working at SSM, Miller discovered Medicare fraud, including but not limited to the examples set forth earlier in this complaint. She complained specifically to Tate on July 9, 2012, through the end of July, 2012.

47.     Miller also complained to the following SSM or HHU employees about the fraud she discovered, but no action was taken:

      a.     HHU Central Intake Manager Mary McKenna.  Dates of complaints:  late June, 2012 to early July, 2012.

      b.     HHU Registered Nurse Pam Kitslaar.  Dates of complaints:  Late June to early July, 2012.

    c.       HHU Registered Nurse Kari Westphal.  Dates of complaints:  Late June to early July, 2012.

    d.       HHU Training and Development Manager Jane Frederick.  Date of complaint:  July 9, 2012.

    e.       HHU & Xtra Care Billing Manager Jane Frederick.  Date of complaint:  July 12, 2012.

    f.       HHU CFO Alred Stucki.  Date of complaint:  July 12, 2012.

    g.       Vice President of Clinical Services and Registered Nurse Lynne Willer.  Date of complaint:  July 17, 2012.

    h.       SSM Quality and Safety Anne Lowry.  Date of complaint: some time during the week of July 9, 2012.

    i.       SSM Vice President of Operations Catherine Trescott.  Date of complaint: July 20, 2012.

    j.       Vice President of Human Resources and Education Susan Winer.  Date of complaint: July 20, 2012.

48.    Examples of SSM's policy to commit fraud are illustrated by the following examples:

    a.       Tate instructed Miller to code for "muscle weakness" instead of "generalized weakness" even when the correct code would have been for generalized weakness.  Tate instructed Miller to code for muscle weakness even when a patient had been hospitalized for pneumonia or a urinary tract infection.

14

      b.      Tate assured Miller, "You know the basics, don't be gun-shy. Code the diagnoses that are case-mix. Remember its not your name on the record – the Nurse has to agree or they need to remove the diagnoses – it's their name when its locked."

49.      SSM and HHU knew the statements / improperly coded bills identified in paragraph 36 were false.

50.      Upon information and belief, SSM and / or HHU made false claims for payment from Medicare for years prior to Miller's discovery.

51.      After Tate assumed her role at SSM, the number of GERD diagnoses reported and billed to Medicare increased dramatically.

52.      Miller filed her initial *qui tam* complaint on December 6, 2012.  The United States initiated an investigation into her claims.

53.      Each of the patients referenced in paragraph 36 were over the age of 65 and eligible for Medicare coverage.

54.      In 2009, 93.5 percent of Americans over the age of 65 were covered by Medicare. Aoa.gov/aoaroot/aging_statistics/profile/2010/docs/2010profile.pdf.

55.      Miller's counsel learned that SSM and HHU submitted some written information to the United States.  Based on communications with the United States, Miller's counsel learned that the United States will not provide that written information to Miller for reasons related to privilege and restrictions placed on the United States by the Health Insurance Portability and Accountability Act and the Trade Secrets Act.  Miller's counsel further learned that the United States is not willing to waive its privilege.

56.     Miller has never had access to the documents that explicitly demonstrate each insurance source, whether private or Medicare, to which HHU submitted fraudulent bills.

<u>FIRST CAUSE OF ACTION – VIOLATION OF THE FALSE CLAIMS ACT</u>
<u>31 U.S.C. SEC. 3729(a)(1)(A)</u>

57.     Plaintiffs hereby incorporates paragraphs 1 - 56 as if set forth fully herein.

58.     By engaging in the foregoing acts, SSM made false or fraudulent claims via the bills it coded that it knew HHU would submit to Medicare for payment while also knowing that the information in those bills was false.

59.     By engaging in the foregoing acts, HHU made false or fraudulent claims via the bills coded by SSM that it (HHU) submitted to Medicare for payment when it knew the bills to contain false information.

60.     This violation has cost the United States of America significant sums in wrongly paid claims.

<u>SECOND CAUSE OF ACTION – VIOLATION OF THE FALSE CLAIMS ACT</u>
<u>31 U.S.C. SEC. 3729(a)(1)(B)</u>

61.     Plaintiffs hereby incorporates paragraphs 1 - 60 as if set forth fully herein.

62.     By engaging in the foregoing acts, SSM and HHU made false or fraudulent statements to the United States in order to receive payment from the United States while knowing the statements they made were false.

63.     This violation has cost the United States of America significant sums in wrongly paid claims.

<u>THIRD CAUSE OF ACTION – CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT</u>

64.     Plaintiffs hereby incorporate paragraphs 1 - 63 as if set forth fully herein.

65.     By engaging in the conduct described in this complaint, SSM and HHU conspired to defraud the Government by getting a false or fraudulent claim paid by the government.

66.     This violation has cost the United States of America significant sums in wrongly paid claims.

WHEREFORE, the United States of America is entitled to damages from the defendants in accordance with the provisions of 31 U.S.C. §§3729-3733, and Plaintiff/Relator requests that judgment be entered against defendants, ordering that:

a.     Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.     Defendants pay an amount equal to three times the amount of damages the United States of American has sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.     Plaintiff/Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.     Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730 (d); and

e.     The United States and Plaintiff/Realtor be granted all such other relief as the Court deems just and proper.

## JURY DEMAND

The plaintiff respectfully requests that this matter be tried before a jury of six (6)

17

competent persons.

       Dated this 2nd day of July, 2014.      **s/ Paul A. Kinne**
                                            Attorney Paul A. Kinne
                                            State Bar No. 1021493
                                            Gingras, Cates & Luebke
                                            8150 Excelsior Drive
                                            Madison, WI 53717
                                            Telephone: 608-833-2632
                                            Fax: 608-833-2874
                                            kinne@gcllawyers.com